1   EDMUND G. BROWN JR.
    Attorney General of California
2   MARSHA S. MILLER
    Supervising Deputy Attorney General
3   BENJAMIN BARNOUW
    Deputy Attorney General
4   State Bar No. 168581
     300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013
     Telephone:  (213) 897-9374
6   Fax:  (213) 897-2810
     E-mail:  Ben.Barnouw@doj.ca.gov
7   *Attorneys for Defendants Octavio Luna, John*
    *Benson, Denise Armas-Carl, Millicent Loyarte,*
8   *Jonathan Monroe, Jim Birks, Roy Bellamy, Eddin*
    *Siregar and Jennifer Atkins*
9

10          IN THE UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                    WESTERN DIVISION

13

14
    **MARC ANTHONY LOWELL**              CV 06-6961 DSF (SS)
15  **ENDSLEY,**
                                         **REPLY BRIEF IN SUPPORT OF**
16                          Plaintiff,   **DEFENDANTS' MOTION FOR**
                                         **SUMMARY JUDGMENT**
17             v.
                                         Date:    No Oral Argument Requested
18  **OCTAVIO LUNA, NIRBHAY**            Time:    N/A
    **SINGH, JON BENSON, DENISE**        Courtroom:    N/A
19  **ARMAS-CARL, MILLICENT**            Judge    Hon. Suzanne H. Segal, M.J.
    **LOYARTE, JONATHAN MONROE,**        Trial Date    No Trial Date Set
20  **JIM BIRKS, ROY BELLAMY, ED**       Action Filed:    December 4, 2006
    **SIREGER AND JENNIFER ATKINS**
21  **SUED IN THEIR INDIVIDUAL**
    **CAPACITIES,**
22
                            Defendants.
23

24        Defendants Octavio Luna ("Luna"), Dr. John Benson ("Dr. Benson"), Denise

25  Armas-Carl ("Armas-Carl"), Millicent Loyarte ("Loyarte"), Jonathan Monroe

26  ("Monroe"), Jim Birks ("Birks"), Roy Bellamy ("Bellamy"), Eddin Siregar

27  ("Siregar") and Jennifer Atkins ("Atkins") submit the following Reply brief in

28  support of their Motion for Summary Judgment.

                                    1

1

**TABLE OF CONTENTS**

2

**Page**

3

Introduction ............................................................................................ 1

4

Memorandum of Points and Authorities ............................................... 1

I.    Argument ................................................................................. 1

5

A.    Plaintiff's Inadequate Treatment Claim Fails ............ 1

6

1.    Plaintiff Cannot Premise Claims on the Consent Judgment ................................................................. 1

7

a.    The Consent Judgment Is Not Applicable ............. 1

8

b.    §1983 Claims Cannot be Based on Consent Judgment ...................... 3

9

c.    Plaintiff Has No "State-Created Liberty Interest" ................... 4

10

2.    Defendants' Treatment Decisions were Constitutional ................ 7

11

a.    Plaintiff's Job and Central Council Position ........... 7

12

b.    Plaintiff's Complaints about Mall Treatment ........ 8

13

B.    Plaintiff's Excessive Force Claims Fail ...................... 10

14

1.    Substantive Due Process Law Governs Plaintiff's Claim .................. 10

15

2.    Standard to be Applied under Substantive Due Process ............... 11

16

3.    There Was no Excessive or Brutal Force Here .............. 14

17

a.    Armas-Carl, Birks and Monroe Used Minimal Force .................... 15

18

b.    Plaintiff Suffered No Lasting Injury or Pain ....... 15

19

c.    Bellamy and Armas-Carl Were Promoting Security ....................... 15

20

d.    Bellamy Did Not Use More Force than Was Necessary ............... 19

21

e.    There is No Evidence Defendants Had Punitive Intent ................. 20

22

f.    Plaintiff's Claim Against Octavio Luna Fails ..... 21

23

g.    Defendants are Entitled to Qualified Immunity ........... 21

24

C.    Plaintiff's Claim Arising from Conditions in the RER Fails ............... 23

25

D.    Plaintiff's Claim against Siregar and Atkins Rails ................... 24

26

E.    Plaintiff Cannot Pursue a Claim Based on Section 884(b)(1) ............... 24

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Page**

        F.      Plaintiff's State Law Claims Fail .............................................. 24

Conclusion ......................................................................................................... 25

1

**Page**

2

3

4

**CASES**

5

*Andrews v. Neer*
    253 F.3d 1052 (8th Cir. 2001) ............................................................ 13

*Bell v. Wolfish*
    441 U.S. at 534-544 ............................................................ 16, 22

*Block v. Rutherford*
    468 U.S. 576, 104 S. Ct. 3227, 82 L. Ed. 2d 438 (1984) ............................ 16

*Bounds v. Smith*
    430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977) ............................ 18

*Brenneman v. Madigan*
    343 F.Supp. 128 (D.C.Cal., 1972) ............................................ 18

*Briggs v. Lawrence*
    230 Cal.App.3d 605, 281 Cal.Rptr. 578 (1991) ................................ 25

*Cagle v. Sutherland*
    334 F.3d 980 ............................................................................ 3

*DeGidio v. Pung*
    920 F.2d 525 (8th Cir.1990) .................................................... 3, 5

*Demery v. Arpaio*
    378 F.3d 1020 (9th Cir. 2004) .................................................... 16

*Fowler v. Howell*
    42 Cal.App.4th 1746, 50 Cal.Rptr.2d 484 (1996) ............................ 25

*Gaut v. Sunn*
    810 F.2d 923 (9th Cir. 1987) (per curiam) .................................... 13

*Graham v. Connor*
    490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) ................ 10, 11

*Green v. McKaskle*
    788 F.2d 1116 (5th Cir. 1986) .................................................... 3

*Hoptowit v. Ray*
    682 F.2d 1237 (9th Cir. 1982) .................................................. 13

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Page**

*Hydrick v. Hunter*
  500 F.3d 978 ........................................................................................... 11, 12, 14

*Karim-Panahi v. Los Angeles Police Dept.*
  839 F.2d 621 (9th Cir.1988)................................................................................. 25

*Kentucky Dept. of Corrections v. Thompson*
  490 U.S. 454, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989) ("*Thompson*") ........................ 4, 5, 6

*Klein v. Zavaras*
  80 F.3d 432 (10th Cir. 1996)................................................................................ 3

*Martel v. Fridovich*
  14 F.3d 1 (1st Cir. 1993) ..................................................................................... 3

*McQuillion v. Duncan*
  306 F.3d 895 (9th Cir. 2002)............................................................................... 7

*Ort v. White*
  813 F.2d 318 (11th Cir., 1987)............................................................................. 23

*Picariello v. Fenton*
  491 F.Supp. 1026 (M.D.Penn. 1980) ..................................................................... 21

*Sandin v. Conner*
  515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995) ...................................... 6, 7

*Saucier v. Katz*
  533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) ...................................... 19

*Smith v. City of Fontana*
  818 F.2d 1411 (9th Cir.), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269
  (1987) ................................................................................................................. 13

*Smith v. Sumner*
  994 F.2d 1401 (9th Cir. 1993)............................................................................. 4, 6

*Soremekun v. Thrifty Payless, Inc.*
  509 F.3d 978 (9th Cir. 2007)............................................................................... 9

*Taylor v. List*
  880 F.2d 1040 (9th Cir. 1989)............................................................................. 8

*Valdez v. Farmon*
  766 F.Supp. 1529 ........................................................................................... 21, 22

**Page**

*Valdez v. Rosenbaum*
  302 F.3d 1039 (9th Cir. 2002) ................................................................ 16

*Welsch v. Likins*
  550 F.2d 1122 (8th Cir. 1977) ................................................................ 18

*White v. Roper*
  901 F.2d 1501 (9th Cir. 1990) .................................................... 12, 13, 14

*Wright v. Rushen*
  642 F.2d 1129 (9th Cir. 1981) ................................................................ 18

*Wyatt v. Stickney*
  344 F.Supp. 373 (M.D.Ala. 1972), *affirmed sub. nom. Wyatt v. Aderholt*, 503 F.2d
  1305 (5th Cir. 1974) ................................................................................ 18

*Youngberg v. Romeo*
  457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) ................................ 1, 7, 12

STATUTES

42 U.S.C. § 1983 ...................................................................................... 1, 3, 4

Cal. Govt. Code, § 945.4 (West 2009) ........................................................ 25

CONSTITUTIONAL PROVISIONS

Eighth Amendment .................................................................................. 23

Fourteenth Amendment ........................................................................ 4, 11

Fourth Amendment .................................................................... 10, 11, 22

**INTRODUCTION**

Plaintiff's Opposition demonstrates that his claims are not supported by any evidence and are based on erroneous legal theories.  Plaintiff's inadequate treatment claim fails because it is based on a Consent Judgment that became effective *after* the events at issue in this case, and because §1983 does not provide Plaintiff a right to sue for violations of a Consent Judgment.  Plaintiff's excessive force claim fails because it is based on a standard that does not apply to individuals in lawful custody, such as Plaintiff.  Finally, Plaintiff's complaints about conditions in the common room ("RER") where patients were required to gather when they chose not to attend treatment fail because there is no evidence of an intent to punish and the conditions were not serious enough to support a Constitutional claim.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   ARGUMENT**

**A.   Plaintiff's Inadequate Treatment Claim Fails**

Plaintiff's opposition fails to raise any triable issues of material fact on his claim of inadequate mental health treatment for two basic reasons.  **First**, he ignores the applicable Constitutional standard established in *Youngberg v. Romeo*, 457 U.S. 307, 321, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982).  He bases his claim on a Consent Judgment entered into between the California Department of Mental Health ("DMH") and the United States Department of Justice ("U.S. DOJ"), but that agreement did not become effective until after the incidents at issue.  Moreover, as a matter of law, Plaintiff cannot premise a §1983 claim on the Consent Judgment.

**Second**, Plaintiff fails to produce any facts supporting his claim.  He does not dispute the detailed declarations of his psychiatrist and social workers that show Plaintiff was provided with treatment based on professional judgment.

**1.   Plaintiff Cannot Premise Claims on the Consent Judgment**

**a.   The Consent Judgment Is Not Applicable**

When it was initially filed in May of 2006, the Consent Judgment applied only

1

1    to Metropolitan State Hospital and Napa State Hospital.  RJN, Exhibit "D"

2    [Document 48-2, at page 17 of 71].[1]  In August of 2006, the parties filed a

3    stipulation providing that the Consent Judgment would also apply to Patton and

4    Atascadero State Hospital.  See RJN, Exhibit "E" [Document 48-3, at pages 38-

5    40].[2]  Thus, the Consent Judgment did not apply to Patton until August of 2006.

6         Four months earlier, in April of 2006, Plaintiff had been transferred from Unit

7    20 and was no longer under the care of Dr. Benson.  See Luna Decl., at ¶5 (in April

8    of 2006 Plaintiff was transferred to Unit 30, under the care of Dr. Schultz).

9    Plaintiff alleges no contact with any of the defendants after his transfer to Unit 30.

10        The only defendant conceivably involved in Plaintiff's treatment after his

11   transfer from Unit 20 was Luna, based on his role in implementing the Mall

12   program as a whole.  However, Plaintiff cannot pursue a claim under the Consent

13   Judgment based on this because the Consent Judgment expressly gave the DMH

14   three years to comply with its requirements.  Specifically, it provided that "all of

15   the terms set forth in Part I hereof shall be implemented at the State Hospitals

16   within 36 months of the Enhancement Plan's effective date, except that §I.3 of the

17   Plan and all provisions of the Plan having to do with suicide prevention measures

18   shall be implemented at the State Hospitals upon the effective date of this Consent

19   Judgment."[3]  RJN, Exhibit "D" [Document 48-3, at page 32 of 72].  Part I of the

20   Consent Judgment is referred to as the "Enhancement Plan," and contains all of the

21   substantive requirements imposed by the Consent Judgment.

22        Thus, under its express terms, compliance with the requirements of the

23

24        [1] The Court is referred to the Request for Judicial Notice filed by Defendants
     in support of their Motion to Dismiss Plaintiff's Third Amended Complaint, which
25   is Document 48, and the exhibits contained in Documents 48-2, 48-3 and 48-4.
           [2] On February 27, 2007, the Court approved an Amended Consent Judgment
26   that applied to all four hospitals -- Napa, Metropolitan, Patton and Atascadero.
     RJN, Exh. "F" [Document 48-3, pages 42-72, and Document 48-4, pages 1-63].
27         [3] The Consent Judgment provided that its "Effective Date" would be the
     "first day of the month following the date of execution of the agreement by all
28   parties."  RJN, Exhibit "D" [Document 48-2, at page 20 of 71].

Consent Judgment was not mandated until 36 months after its effective date (except for specific provisions related to suicide prevention, which are not applicable here). Even assuming the three-year period began to run for Patton when the Consent Judgment was first filed in May of 2006, the period lasted until June of 2009. Plaintiff was transferred from Patton to Atascadero State Hospital ("Atascadero") in May of 2008, more than a year before that date.  Luna Decl., at ¶5.  At the very least, Luna is entitled to qualified immunity on any claim under the Consent Judgment because it was not clear that he could be subjected to personal liability before the provisions of the Consent Judgment were required to be implemented.

**b.   §1983 Claims Cannot be Based on Consent Judgment**

A civil rights claim under 42 U.S.C. §1983 cannot be premised on alleged violations of a consent judgment or decree.  *Cagle v. Sutherland*, 334 F.3d 980. 986-987 (11th Cir. 2003); *Klein v. Zavaras*, 80 F.3d 432, 435 (10th Cir. 1996); *Martel v. Fridovich*, 14 F.3d 1, 3 and n. 4 (1st Cir. 1993); *DeGidio v. Pung*, 920 F.2d 525, 534 (8th Cir. 1990); *Green v. McKaskle*, 788 F.2d 1116 (5th Cir. 1986). In *Klein,* the Tenth Circuit Court of Appeals summarized the reasons for this as follows:

> "Remedial decrees do not create or enlarge constitutional rights, or create 'rights ... secured by the laws,' 42 U.S.C. § 1983, 'sufficient to serve as a basis for liability under § 1983.'  *Green*, 788 F.2d at 1122-23 [*Green v. McKaskle*, 788 F.2d 1116 (5th Cir. 1986)].  Allowing enforcement of consent decrees under §1983 would 'discourage prison officials from agreeing to such benefits.'  *Id*; *See also Pung*, 920 F.2d at 534 [*DeGidio v. Pung*, 920 F.2d 525 (8th Cir. 1990)] ('Compliance would be deterred if individual prisoners were allowed to seek damages for violations of every detail of the decree.  Accordingly, we decline to hold that a consent decree may be enforced through a Section 1983 action.')"

*Klein v. Zavaras*, 80 F.3d at 535.  Here, the Consent Judgment upon which Plaintiff relies is a settlement agreement between the State of California (acting through the DMH) and the United States government.  The document does not grant patients

3

1  any private cause of action for violation of its terms.  As a result, it cannot be the

2  basis for a §1983 claim.[4]

3            **c.**     **Plaintiff Has No "State-Created Liberty Interest"**

4        In the Report and Recommendation on Defendants' Motion to Dismiss

5  [Document 91], this Court cited *Smith v. Sumner*, 994 F.2d 1401, 1406 (9th Cir.

6  1993), for the proposition that a consent decree "can create liberty interests

7  protected by the Due Process Clause of the Fourteenth Amendment and can serve

8  as a basis for §1983 actions."   Report and Recommendation of United States

9  Magistrate Judge re Motion to Dismiss [Document 91, at page 14 of 20].  Plaintiff

10  makes no argument in his Opposition that the Consent Judgment creates a

11  protectable "liberty interest."  However, given this Court's citation to *Smith v.*

12  *Sumner*, this Reply memorandum will address whether the Consent Judgment

13  created any "liberty interest" protected under the Fourteenth Amendment.

14        In *Smith v. Sumner*, the Ninth Circuit considered whether a consent decree

15  providing "that an inmate at the Nevada State Prison . . . is entitled to the

16  representation of an attorney at hearings on serious disciplinary infractions,

17  provided an inmate retains an attorney at his own expense," created a "liberty

18  interest" under the criteria announced by the Supreme Court in *Kentucky Dept. of*

19  *Corrections v. Thompson*, 490 U.S. 454, 462-463, 109 S. Ct. 1904, 104 L. Ed. 2d

20  506 (1989) ("*Thompson*").  *Smith v. Sumner*, 994 F.2d at 1405-1406.  In *Thompson*,

21  the Court analyzed a *procedural* due process claim[5] based on prison regulations:

22  "We examine procedural due process questions in two steps:  the first asks whether

23  there exists a liberty or property interest which has been interfered with by the State;

24  the second examines whether the procedures attendant upon that deprivation were

25  constitutionally sufficient[.]"  *Thompson*, 490 U.S. at 160 (citations omitted).  As

26                  [4] The Consent Judgment does not give patients at any institution a private

27  cause of action against individual employees of the DMH.  See RJN, Exhibit "D" [Document 48-3, at pages 26-34 of 72].

          [5] Plaintiff's TAC does not assert any *procedural* due process claims.

28

1   the Court explained, "[p]rotected liberty interests 'may arise from two sources – the

2   Due Process Clause itself and the laws of the states.'" *Id.* (citation omitted).

3        The Court laid out two separate requirements for a state law to create a

4   protected "liberty interest": **First**, "[s]tated simply, 'a State creates a protected

5   liberty interest by placing substantive limitations on official discretion.' A State

6   may do this in a number of ways. * * * Our past decisions suggest, however, that

7   the most common manner in which a State creates a liberty interest is by

8   establishing 'substantive predicates' to govern official decision-making, and,

9   further, by mandating the outcome to be reached upon a finding that the relevant

10  criteria have been met." *Thompson*, 490 U.S. at 462 (citations omitted). **Second**,

11  "[w]e have also articulated a requirement, implicit in our earlier decisions, that the

12  regulations contain explicitly mandatory language, i.e., specific directives to the

13  decisionmaker that if the regulations' substantive predicates are present, a particular

14  outcome must follow, in order to create a liberty interest." *Id.*, at 463.

15       In *Thompson*, the Court concluded that the regulations at issue did not create

16  protected liberty interests because they "lack the requisite relevant mandatory

17  language. They stop short of requiring that a particular result is to be reached upon

18  a finding that the substantive predicates are met." *Id.*, at 464; s*ee DeGidio v. Pung*,

19  920 F.2d at 535 (Court rejects "state-created liberty interest" claim based on a

20  consent decree because "the decree does not place substantive restrictions on the

21  exercise of discretion by Stillwater's officials. None of the decree's provisions

22  require that the officials do anything based upon substantive criteria.")

23       In this case, the provisions of the Consent Judgment do not contain "specific

24  directives to the decisionmaker that if the regulations' substantive predicates are

25  present, a particular outcome must follow[.]" *Thompson*, 490 U.S. at 462-463. The

26  essence of Plaintiff's argument is that "[a]ny treatment decision made not consistent

27  with 'Recovery Philosophy' and 'Psychsocial [sic] Rehabilitation Model' violate

28

1  Plaintiff's rights under the Consent Judgment and the authorities it is based on." [6]

2  Opposition Memorandum [Document 131], at page 4 of 16, lines 6-9.  Simply put,

3  such a general direction to use a theory or approach to treatment does not constitute

4  "specific directives . . . that a particular outcome must follow."  Plaintiff cites

5  several provisions of the Consent Judgment in paragraph 13 of his TAC, but none

6  provide "specific directives" or require any "particular outcome."

7  In addition, the Consent Judgment does not create any protected "liberty

8  interest" because none of the provisions at issue impact a patient's "liberty".

9  Notably, the Ninth Circuit in *Smith v. Sumner* construed the protected liberty

10  interest not as a right to retain an attorney, as the terms of Consent Judgment in that

11  case provided, but as an "interest in not being convicted of a major violation [in the

12  prison's disciplinary system] without the assistance of retained counsel, because it

13  is the consequences of conviction which could affect an inmate's 'liberty.'"  *Smith*

14  *v. Sumner*, 994 F.2d 1401, 1406 (9th Cir. 1993).  As the Court explained, "even if

15  guaranteed by language that appears to satisfy *Thompson*, the right to retain counsel

16  conferred by the consent decree is not itself a protected liberty interest.  An

17  inmate's 'liberty' surely can be affected if that inmate is convicted of a major

18  violation without having the assistance of counsel in defending himself, but it is

19  equally certain that an inmate's 'liberty' is in no sense affected by the absence of

20  counsel when the inmate is not convicted."  *Id.*, at 1407.  Here, none of the

21  provisions of the Consent Judgment cited by Plaintiff impact a patient's "liberty".[7]

22  _____

[6] The Consent Judgment contains the following statement in its introduction:
"Each State Hospital shall use a Recovery philosophy of care and a Psychiatric

23  Rehabilitation model of service delivery."

[7] In *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418

24  (1995), the Supreme Court rejected the approach used in *Thompson* and some prior
cases, and adopted a test focused on the nature of the state-created liberty interest.

25  Under *Sandin*, protectable interests "will be generally limited to freedom from
restraint which, while not exceeding the sentence in such an unexpected manner as

26  to give rise to protection by the Due Process Clause of its own force, nonetheless
imposes atypical and significant hardship on the inmate in relation to the ordinary

27  incidents of prison life." *Id.*, at 484.  It is unclear whether *Sandin v. Conner* is
applicable here.  *See McQuillion v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002).  In

28  (continued…)

### 2.    Defendants' Treatment Decisions were Constitutional

The standard governing Plaintiff's claims regarding his mental health treatment was articulated by the Supreme Court in *Youngberg v. Romeo*: "the Constitution only requires that the courts make certain that professional judgment in fact was exercised.  It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."  *Youngberg v. Romeo*, 457 U.S. at 321.  Plaintiff's claim fails under this standard because he does not dispute the declarations of his psychiatrist, Dr. John Benson, and his social workers, Hope Marriott and Holly Melvin, which show that his treatment was based on "professional judgment".

### a.    Plaintiff's Job and Central Council Position

The focus of Plaintiff's claim is that his job (known as an "I.T. assignment") and his position on the patients' Central Council were taken away from him despite his belief they were therapeutic.  However, as is shown in the declarations of Dr. Benson, Ms. Marriott and Ms. Melvin, the decision to take away Plaintiff's I.T. assignment and Central Council position was considered by the treatment team, and was made for treatment purposes.  Plaintiff does not dispute this evidence.  He does argue that his diagnosis and history of refusing to participate in treatment are "irrelevant" (see Opposition at page 4, lines 16-18), but that argument is absurd.  Plaintiff's diagnosis and his history of refusing treatment necessarily and properly informed the treatment decisions made by Plaintiff's treatment team at Patton.

### b.    Plaintiff's Complaints about Mall Treatment

The declarations of Plaintiff's treatment providers establish that, in their professional judgment, Mall treatment groups were beneficial to Plaintiff, or would have been had he decided to attend them.  Plaintiff does not dispute this evidence.

---

(…continued)

any event, however, the provisions of the Consent Judgment at issue do not create any enforceable "liberty interest" under the *Sandin* test because they do not implicate "freedom from restraint."  *Sandin*, 515 U.S. at 484.

1       Nor does Plaintiff produce any evidence to counter Luna's declaration, which

2   explains the basis for the structure of the Mall Treatment program, and its

3   requirement that treatment occur during set hours of the day.

4       Furthermore, Plaintiff's complaints about Mall treatment cannot be viewed in

5   isolation, and the undisputed evidence shows that treatment was provided to

6   Plaintiff, or made available to him, beyond the Mall group sessions.  Plaintiff was

7   provided with individual counseling, and he refused to engage in such counseling at

8   various points.  Plaintiff also received medication, and benefitted from a structured

9   environment in which to live.

10       In his TAC, Plaintiff cites a May 2, 2006 letter from the U.S. DOJ concerning

11   its investigation of Patton.  See TAC, at ¶25.  This letter does not help Plaintiff

12   because it contains only conclusions; even if it did contain specific information, that

13   information would be inadmissible hearsay.  Most importantly, there is no

14   indication that any of the U.S. DOJ's assertions involved Plaintiff in any way.[8]

15   Similarly, the allegation in that paragraph that "[t]o date, plaintiff continues to be

16   deprived adequate care and is required to attend Mall that does not address his

17   specific needs, he did not choose, and does not satisfy his treatment plan (PATTON

18   FINDINGS page 7)" is unavailing because it is devoid of any specific facts.  "A

19   summary judgment motion cannot be defeated by relying solely on conclusory

20   allegations unsupported by factual data."  *Taylor v. List*, 880 F.2d 1040, 1045 (9th

21   Cir. 1989); *see Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.

22   2007).

23       The only specific facts concerning Plaintiff's involvement in the Mall program

24   are provided by Dr. Benson and social workers Hope Marriott and Holly Melvin.

25   
_____

26   [8] It is evident that Plaintiff's allegation, in paragraph 25 of his TAC, that
Mall Treatment "does not address his specific needs, he did not choose, and does
not satisfy his treatment plan" is based on the allegations made by the U.S. DOJ in
27   its May 2, 2006 letter.  Indeed, Plaintiff cites to that letter ("Patton Findings") in
that paragraph and quotes from it as well.  See TAC, at ¶25.
28

Their declarations show that, in their professional judgment, Mall groups provided many benefits to patients, including Plaintiff.  Furthermore, Ms. Marriott's declaration states that Plaintiff participated in two groups that she facilitated, that both had topics relevant to Plaintiff, especially to address his poor social interaction skills.[9]  Again, Plaintiff does not dispute these declarations.

Finally, Plaintiff testified to having three basic criticisms of the Mall Program, but none can support a constitutional claim against Luna based on his role in implementing the program.  Plaintiff complained that there was a lack of choice because patients had to go to either their Mall group or the RER.  See Depo., at page 53, lines 6-21.  The use of the RER is a security issue, not a treatment issue.  As is discussed in more detail below, Patton's policy requiring that patients leave their rooms during Mall treatment, and that they go to the RER if they did not wish to go to their Mall group, is rationally related to security.  Moreover, all patients, including Plaintiff, were given the option to attend treatment in the form of a Mall group; those in the RER chose to not accept that option and go to the RER instead.

Plaintiff also complained that patients were not provided with adequate treatment in the RER.  See Depo., at page 54, line 1 – page 55, line 2.  However, the RER was not designed to constitute treatment; to the contrary, it was established for safety and security purposes.  There is no constitutional requirement that patients be provided with treatment at all times, or at any specific times.  Nor is there any constitutional requirement that patients be provided with alternate forms of treatment if they refused to accept the treatment offered them.

Plaintiff further complained that patients were required to receive 20 hours of treatment and that only activities occurring during the Mall program hours would be counted towards the 20-hour requirement.  See Depo., at page 56, lines 15-21.

_____

[9]  At his deposition, Plaintiff admitted that Hope Marriott was "very professional" in running her groups.  Depo., page 65, lines 1-7.  Even so, Plaintiff's participation in the groups facilitated by Ms. Marriott was uneven, and lessened over time.  Marriott Decl., at ¶23.

The structure of the Mall program was based on "professional judgment."  The undisputed evidence shows that various officials of the DMH, Luna among them, made the decision to adopt the Mall treatment program, and to have it structured the way it was, based on the professional judgment and recommendation of Dr. Nirbhay Singh, a consultant hired by the DMH.  Luna Decl., at ¶¶7, 11-13. Plaintiff offers no evidence that Dr. Singh was not capable of providing professional judgment, nor does he offer any evidence showing that Dr. Singh's recommendations were in any way inappropriate.  All patients were required to receive treatment during the Mall hours so that staff resources could be used most efficiently and to provide structure to patients' lives, which helps to prepare them for CONREP and release into the community.  Luna Decl., at ¶¶15-16; see Benson Decl., at ¶29; Marriott Decl., at ¶22.  Plaintiff does not dispute any of this evidence.

**B.    Plaintiff's Excessive Force Claims Fail**

Plaintiff's excessive force claims against Bellamy, Armas-Carl, Monroe, Birks and Luna fail.  His claims against Bellamy, Armas-Carl, Monroe and Birks stem from separate incidents.  His claim against Luna, the Executive Director of Patton, is based on the claims against Bellamy, Armas-Carl, Monroe and Birks.

**1.    Substantive Due Process Law Governs Plaintiff's Claim**

In his Opposition, Plaintiff does not address Defendants' arguments as to why the use of force did not violate his right to substantive due process.  Instead, Plaintiff now argues that his excessive force claims are governed by the Fourth Amendment, and he analyzes his claims under the Supreme Court's seminal Fourth Amendment excessive force case, *Graham v. Connor*.  Plaintiff's approach is completely unavailing because substantive due process principles apply to Plaintiff's excessive force claim, and the Fourth Amendment does not.

Plaintiff relies on *Hydrick v. Hunter*, 500 F.3d 978 99th Cir. 2007), for the proposition that the Fourth Amendment applies to excessive force claims by involuntarily committed individuals, **but the Ninth Circuit in that case in fact**

10

1   **held that Fourteenth Amendment substantive due process principles apply to**

2   **such claims**.  *Hydrick*, 500 F.3d at 997.  With respect to the "clearly established

3   law" regarding the plaintiffs' excessive force claims, the Court held as follows:

4   
5   "It is well-established that detained persons have a right to be free from
    excessive force.  While excessive force claims by prisoners are reviewed

6   under the Eighth Amendment's malicious and sadistic standard, *Hudson
    v. McMillian*, 503 U.S. 1, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992), **the**

7   **more generous Fourteenth Amendment standard applies to those
    who are civilly confined.**"

8   
9   *Hydrick*, 500 F.3d at 997 (bold emphasis added).

10  Finally, Plaintiff misleadingly quotes from *Graham v. Connor* to suggest that

11  the Supreme Court held that the Fourth Amendment applies to all claims of

12  excessive force.  In fact, the Court held in that case that the Fourth Amendment

13  applies to excessive force claims arising from a seizure of a "free citizen":  "Today

14  we make explicit what was implicit in *Garner*'s analysis, and hold that all claims

15  that law enforcement officers have used excessive force-deadly or not-in the course

16  of an arrest, investigatory stop, or other 'seizure' **of a free citizen** should be

17  analyzed under the Fourth Amendment and its 'reasonableness' standard, rather

18  than under a 'substantive due process' approach."  *Graham v. Connor*, 490 U.S.

19  386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (bold emphasis added).

20  **2.   Standard to be Applied under Substantive Due Process**

21  In *Hydrick v. Hunter*, the Court set forth the framework for analyzing the

22  plaintiffs' excessive force claims as follows:

23  "The Fourteenth Amendment requires that civilly committed persons not

24  be subjected to conditions that amount to punishment, *Bell*, 441 U.S. at
    536, 99 S.Ct. 1861, within the bounds of professional discretion,

25  *Youngberg*, 457 U.S. at 321-22, 102 S.Ct. 2452.  Moreover, 'due process
    requires that the conditions and duration of confinement [for civilly

26  confined persons] bear some reasonable relation to the purpose for which
    persons are committed.' *Seling*, 531 U.S. at 265, 121 S. Ct. 727; *see also*

27  *Jones*, 393 F.3d at 931.  While the nature of an SVP's confinement may

28  

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> factor in this balance of what is reasonable, it is clearly established that the substantive due process protections of the Fourteenth Amendment apply to SVPs."

*Hydrick v. Hunter*, 500 F.3d at 997-998. The plaintiffs in *Hydrick* alleged "that force is used in retaliation for exercising legitimate rights and that the amount of force used is often a gross overreaction to the situation." *Id.*, at 998. In affirming the denial of the defendants' motion to dismiss, the Ninth Circuit held, "[s]uch a use of force, if proved, is not reasonable and failure to curtail such abuses cannot be said to be within the Defendants' professional discretion." *Id.*, at 998.

In *White v. Roper*, the Ninth Circuit applied substantive due process law to claims of excessive force and deliberate indifference asserted by a pretrial detainee. *White v. Roper*, 901 F.2d 1501, 1502 (9th Cir. 1990). The plaintiff had alleged that guards had attempted to place him in a cell with another detainee (Shaw), who was dangerous. Plaintiff "refused to enter Shaw's cell and backed away from the entrance, moving down the cell block corridor." *Id.*, at 1503. "[Defendant] Sergeant Roper and some of the deputies followed [plaintiff] White, forcibly subdued him and, according to White, in subduing him caused him to suffer a cut wrist and 'bruises all over his body.'" *Id.*, at 1503. The Court first reversed the summary judgment on plaintiff's "deliberate indifference" claim based on defendants' attempt to place him in Shaw's cell. *Id.*, at 1506. On the excessive force claim, however, the Court upheld the summary judgment. *Id.*, at 1507. The Court set forth the following framework for analyzing the excessive force claim:

> "We have stated that 'egregious government conduct in the form of excessive and brutal use of physical force constitutes a violation of substantive due process' cognizable under section 1983. *Smith v. City of Fontana*, 818 F.2d 1411, 1417 (9th Cir.) (emphasis deleted), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987); *see also Gaut v. Sunn*, 810 F.2d 923, 924 (9th Cir. 1987) (per curiam) ('[p]rison beatings which "shock the conscience" are actionable under section 1983'). '[R]esolving a substantive due process claim requires courts to balance

several factors focusing on the reasonableness of the officers' actions given the circumstances.' *Smith*, 818 F.2d at 1417. These factors are (1) the need for the application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury inflicted, and (4) whether force was applied in a good faith effort to maintain and restore discipline." *Id.*; *see also Gaut*, 810 F.2d at 924 (listing these same factors); *Hoptowit v. Ray*, 682 F.2d 1237, 1251 (9th Cir. 1982) ('guards may use force only in proportion to the need in each situation')."

*White v. Roper*, 901 F.2d at 1507. Applying these principles, the Court held:

"White does not dispute that he refused to enter Shaw's cell and backed away from Sergeant Roper, moving down the cell block corridor. Even if White did so to avoid being injured by Shaw, his actions created a need for Sergeant Roper and the deputies to apply reasonable force to control him. **The amount and type of force used is disputed by the parties. However, White has not shown that he required or even that he requested medical treatment for the cut wrist and the bruises he allegedly suffered. White does not allege that he lost consciousness at any time, or that he suffered any permanent injury. We conclude that White has not made a showing sufficient to establish that the use of force against him was 'excessive' or 'brutal.'** The district court properly granted summary judgment on this claim."

*Id.*, at 1507 (bold emphasis added).

The factors set forth in the test adopted in *White v. Roper* are also incorporated into the jury instructions approved by the Eighth Circuit in *Andrews v. Neer*, 253 F.3d 1052, 1061 and n. 7 (8th Cir. 2001). In a pretrial order in *Henderson v. City and County of San Francisco*, the District Court held that substantive due process governed the plaintiff's excessive force claim and incorporated the same factors into the jury instructions as follows:

- In order for plaintiff Henderson to prove that one or more of the defendants used excessive force in violation of his constitutional rights, he must prove by a preponderance of the evidence that one or more of the defendants inflicted pain on him unnecessarily and wantonly.
- One definition of unnecessary and wanton infliction of pain is the sadistic and malicious infliction of pain for the very purpose of causing harm.

- Another definition is the infliction of pain totally without penological justification.
- In the context of the instant case, in which the plaintiff is detained after arraignment and pending trial, penological justification means justification based on maintaining order and safe conditions in the jail.
- In determining whether defendants unnecessarily and wantonly inflicted pain, you may consider (1) the need for the application of force against plaintiff Henderson, (2) the relationship between that need and the amount of force used, (3) the threat defendants reasonably perceived to be posed by plaintiff Henderson, (4) any efforts by the defendants to temper or reduce the degree of force used, and (5) the severity of injury inflicted on plaintiff Henderson.

*Henderson v. City and County of San Francisco*, Order Issuing Jury Instruction on Substantive Law Applicable to the Claim (Earnest Henderson Trial), 2007 WL 2778682, *2 (N.D. Cal., Sept. 21, 2007) ("*Henderson*").

### 3.    There Was no Excessive or Brutal Force Here

Under the foregoing standards, the undisputed evidence shows that no defendant used force in violation of Plaintiff's substantive due process rights. When force was used, it was not "excessive" or "brutal" (*White v. Roper*, 901 F.2d at 1507), it was not "used in retaliation for exercising legitimate rights" (*Hydrick v. Hunter*, 500 F.3d at 998), it was not a "gross overreaction to the situation" (*id.*), and it was not used "for the very purpose of causing harm" or "without penological justification" (*Henderson*, 2007 WL 2778682, *2).

First, Armas-Carl did not use any force, and Monroe and Birks used at most a *de minimis* amount of force.

Second, Plaintiff suffered no lasting injury, or even lasting pain, as a result of any of the incidents.

Third, Bellamy and Armas-Carl were enforcing a valid security policy in effect at Patton, under which patients could not remain alone in their own rooms while the Mall program was in session, and had to go either to their assigned Mall group or the RER.

Fourth, as to the incidents involving Bellamy, Plaintiff admits that Bellamy did not use any amount of force beyond what was needed to move Plaintiff to effect Patton's security policy or to contain Plaintiff when he physically resisted.

Fifth, there is no evidence that any defendant had any intent to punish Plaintiff.

Finally, the claim against Luna fails because there is no evidence any other defendant used excessive force.

### a. Armas-Carl, Birks and Monroe Used Minimal Force

The evidence, viewed most favorably to Plaintiff, shows that Armas-Carl did not use any actual force, and that Monroe and Birks used at most a *de minimis* amount of force – Monroe tipped a chair causing Plaintiff to sit up, and Birks caused his walkie-talkie to beep into Plaintiff's ear twice.[10]

### b. Plaintiff Suffered No Lasting Injury or Pain

The undisputed evidence shows that Plaintiff did not suffer any lasting injury or pain as a result of any of the incidents involving Bellamy.  Depo., at page 113, lines 12-16.  The incident involving Armas-Carl did not involve any actual use of force.  Depo., at page 101, line 21 – page 102, line 1.  Plaintiff did not suffer any injury as a result of the incident involving Monroe.  Depo., at page 129, lines 11-13.  Plaintiff suffered no injury as a result of Birks allegedly causing his walkie-talkie to beep in Plaintiff's ear.  Depo., at page 125, lines 2-4.

### c. Bellamy and Armas-Carl Were Promoting Security

The undisputed facts shows that Bellamy and Armas-Carl were enforcing Patton's rule that, while the Mall treatment program was in session each day, patients had to either attend their Mall group or go to a common room (the RER).

---

[10] Plaintiff contends that Birks has "changed his story" and appears to make similar claims as to Monroe and Armas-Carl.  Opposition Memorandum [Document 131], at page 14 of 16, lines 13-15, 19-20, and at page 15, lines 13-14. This is simply not true.  Plaintiff presents no evidence that Birks, Armas-Carl or Monroe has stated the facts differently at any time.  In any event, these defendants are moving for summary judgment based on the facts viewed in Plaintiff's favor.

1    This policy is constitutional.  First, it imposes only a *de minimis* hardship for

2    patients who choose not to go to their assigned Mall treatment group to go to a

3    common room to be monitored while the Mall program is in session.  *Bell v.*

4    *Wolfish*, 441 U.S. at 534-544.   In other words, having to go either to a treatment

5    session or a common room to be monitored does not "significantly exceed," nor is

6    it "independent of," "the inherent discomforts of confinement" in a state psychiatric

7    hospital.  *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004).

8    Second, even if a restriction is more than *de minimis*, it does not constitute

9    "punishment" if it is "rationally related to a legitimate nonpunitive governmental

10   purpose and [does not] appear excessive in relation to that purpose."  *Bell v.*

11   *Wolfish*, 441 U.S. at 561; see *id.*, at 538-539.  This test only requires a logical

12   connection.  Thus, in *Block v. Rutherford*, the Supreme Court overturned the lower

13   courts' rulings that the Los Angeles County Jail's policy of not allowing pretrial

14   detainees contact visits violated substantive due process.  *Block v. Rutherford*, 468

15   U.S. 576, 104 S. Ct. 3227, 82 L. Ed. 2d 438 (1984).  The Court first outlined the

16   limited scope of the inquiry, stating, "because there is no dispute that internal

17   security of detention facilities is a legitimate governmental interest, our inquiry is

18   simply whether petitioners' blanket prohibition on contact visits at Central Jail is

19   reasonably related to the security of that facility."  *Id.*, at 586.  The Court then held

20   that it was "too obvious to warrant extended discussion" that "there is a valid,

21   rational connection between a ban on contact visits and internal security of a

22   detention facility."  *Id.*, at 586.  Therefore, the Court concluded that the policy was

23   constitutional:  "On this record, we must conclude that the District Court simply

24   misperceived the limited scope of judicial inquiry under *Wolfish*.  When the District

25   Court found that many factors counseled against contact visits, its inquiry should

26   have ended."  *Id.*, at 589; *see Valdez v. Rosenbaum*, 302 F.3d 1039, 1045-1046 (9th

27   Cir. 2002) ("The only question that we must answer is whether the defendants'

28

1   judgment was 'rational,' that is, whether the defendants might reasonably have

2   thought that the policy would advance its interests.").

3        At Patton, during the Mall program, there are too few staff members on the

4   units to monitor patients in their rooms.  Luna Decl., at ¶¶21-23.  Thus, Patton has a

5   legitimate interest in closely monitoring these patients to try to preclude them from

6   committing violent acts on staff, other patients, or themselves.  In sum, the rule is

7   rationally related to Patton's legitimate interests in promoting safety and security.

8        Plaintiff quibbles with the need for the policy, but none of his arguments

9   shows that the policy is not "reasonably related" to security concerns.  Plaintiff

10  states, "Defendants' only argument with even a kernel of merit may be that they do

11  not have enough staff to do walk-throughs and monitor the residential units for

12  'emergencies' and do Mall."  Opposition Memorandum, at page 9, lines 7-9.  Then,

13  Plaintiff inexplicably contends that "this argument, even if true, does not justify

14  their requiring plaintiff to go to Refusal, let alone use of force."  In fact, this

15  situation does justify requiring patients to leave their rooms while the Mall program

16  was in session.  The fact that staff who periodically monitor patients in their rooms

17  cannot do so during the Mall program shows that Patton's policy is rationally

18  related to safety and security.  Plaintiff argues that because some of the Mall groups

19  were held on the units, staff involved in those Mall groups could monitor patients in

20  their bedrooms.  However, it makes sense to not burden a staff member involved in

21  a Mall group with the responsibility of monitoring patients not in that group.

22       Plaintiff also relies on assertions made by the U.S. DOJ in a May 2, 2006 letter

23  concerning its investigation of Patton and its claim that the RER does not comport

24  with accepted standards of care.  See Opposition Memorandum [Document 131], at

25  page 10 of 16, lines 14-17.  This letter does not help Plaintiff.  First, there is no

26  constitutional requirement that Patton provide treatment in the RER.  Patients who

27  are present in the RER have by definition chosen not to participate in treatment

28  being made available to them, i.e., their assigned Mall group.  Second, there is no

indication that any of the U.S. DOJ's assertions involved Plaintiff in any way.  As is extensively set out in the declarations filed by Plaintiff's treatment team members, Plaintiff received adequate mental health treatment.  Third, the assertions in the letter are only legal conclusions; even if the letter did contain facts, they would be inadmissible as hearsay.

Finally, Plaintiff argues that Defendants cannot claim the policy is needed because of "inadequate resources," and he argues that "defendants should be required to hire more staff."  Opposition Memorandum [Document 131], at page 10 of 16, line 22- page 11, line 14.  Again, this argument does not address the rational basis for the policy.  The restriction at issue is constitutional because it has a rational relationship with Patton's legitimate safety and security concerns.  The cases Plaintiff cites are unavailing, as none involved damages claims against individuals being sued in their individual, as opposed to official, capacity.[11]

In sum, Patton's policy requiring that patients vacate their own rooms while the Mall program is in session, and either go to their assigned Mall group or to a common room to be monitored, constitutes a *de minimis* hardship on patients, and is rationally related to security concerns.  It is therefore constitutional.  Even if this Court concludes that there is any doubt about the constitutionality of this policy, the

_____

[11] *See Wyatt v. Stickney*, 344 F.Supp. 373, 377 (M.D.Ala. 1972), *affirmed sub. nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974) (Class action in which the District Court entered a decree; "[t]he responsibility for appropriate funding ultimately must fall, of course, upon the State Legislature and, to a lesser degree, upon the defendant Mental Health Board of Alabama"); *Welsch v. Likins*, 550 F.2d 1122, 1124 (8th Cir. 1977) (Class action brought against "the Commissioner of Public Welfare of the State of Minnesota, certain subordinate officials of the Department, the Minnesota State Commissioner of Administration, and the Minnesota State Commissioner of Finance"); *Brenneman v. Madigan*, 343 F.Supp. 128, 130 (D.C.Cal., 1972) (Class action brought against "the Sheriff and the members of the Board of Supervisors of Alameda County"); *Bounds v. Smith*, 430 U.S. 817, 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977) ("The issue in this case is whether States must protect the right of prisoners to access to the courts by providing them with law libraries or alternative sources of legal knowledge."); *Wright v. Rushen*, 642 F.2d 1129, 1130 (9th Cir. 1981) ("he issue is whether the district court properly issued a preliminary injunction mandating extensive changes at three California state prisons.").

Defendants are entitled to qualified immunity because there is no clearly established law precluding the use of such a security measure. *See Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) ("[t]he contours of the [constitutional] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.")

### d.   Bellamy Did Not Use More Force than Was Necessary

As to the incidents involving Bellamy, Plaintiff admits that on each occasion Bellamy did not use any force beyond what was necessary to move him when he refused to move.  Plaintiff testified that on July 6 Bellamy "did not use more force than was called for for the purpose of moving me out of the room."  Depo., at page 160, lines 13-17.[12]  As to the July 21 incident, Plaintiff testified that the only way Bellamy and the other staff could have gotten him to the RER was to carry him, and that they did not use more force than was needed to accomplish that task.  Depo., at page 166, lines 9-11, 22-24.  On July 22, Plaintiff started by walking, but then put his entire bodyweight of about 200 pounds on the staff members without warning them, with the result that he was dropped.  Depo., at page 167, lines 14-18, 21-24; at page 168, lines 19-25.  In his Opposition Plaintiff complains about being dropped (Opposition Memorandum [Document 131], at page 8 of 16, lines 22-26), but at his deposition, he admitted that the staff members did not drop him intentionally.  Depo., at page 168, line 19 – page 169, line 9 ("Q:  Based on your recollection of how the events occurred, were you dropped to the floor because the weight that you added by going limp caused them to drop you?  A:  Yes.  * * *  I don't believe they dropped me intentionally.").  As Plaintiff further testified, "[t]hey were expecting

---

[12] On July 6, Plaintiff admits he was walking under his own power.  Depo., at page 140, line 24 – page 141, line 6.  In his Opposition, Plaintiff points out that he claims his arms were twisted painfully behind his back.  Opposition [Document 131], at page 8 of 16, lines 18-22.  However, Plaintiff admits that no unnecessary force was used (Depo., at page 160, lines 13-17) and it is to be expected that a person will feel some discomfort when he or she is moved despite their resistance. *See Saucier v. Katz*, 533 U.S. at 208-209 (finding no excessive force from a "gratuitously violent shove" by officers during arrest, where there was no injury).

1  me to comply with being physically moved.  And I felt like it was time to stop

2  complying."  Depo., at page 169, lines 1-3.

3       On July 25, the staff members pulled Plaintiff to a seated position in a manner

4  not intended to hurt him.  Depo., at page 171, line 25 – page 172, line 2.  Plaintiff

5  was pushed against the wall in his room, but this was done after he physically

6  resisted and no more force was used than was needed to contain him.  Depo., at

7  page 176, line 18 – page 177, line 2.  Later, in the hallway, Plaintiff physically

8  resisted and was taken the ground, but again no more force was used than necessary

9  to contain him.  Depo., at page 179, lines 7-9; at page 180, lines 6-10.

10       **e.**    **There is No Evidence Defendants Had Punitive Intent**

11       Plaintiff presents no evidence that Bellamy had any intent to punish Plaintiff

12  or to cause him any harm.  See Depo., at page 160, lines 7-9 ("Q.  Did [Roy

13  Bellamy] – as far as you know, did he have any ill will towards you?  A.  Not that I

14  know of.").  Nor does he present any evidence that Armas-Carl was doing anything

15  other than following orders in directing him to go to the RER.  Depo., at page 107,

16  lines 5-7.  Plaintiff does not have any reason to believe that Monroe has any ill will

17  towards him.  Depo., at page 130, lines 10-13.

18       As to the one incident involving Birks, Birks states that he was concerned

19  because Plaintiff had a wool cap over his face, making it hard to assess his medical

20  status.  Birks Decl., at ¶10.  Birks asked Plaintiff is he was okay, but Plaintiff did

21  not respond.  Id., at ¶10.  Plaintiff admits that he was aware that Birks was talking

22  to him, but he did not respond for possibly as long as a minute.  Depo., at page 121,

23  line 8 – page 122, line 1.  Plaintiff claims that Birks put a walkie-talkie radio next

24  to his ear and initiated a communication, causing the device to make a "beeping

25  noise."  Depo., at page 117, line 23 – page 118, line 2.  Even assuming Birks did

26  this to wake Plaintiff up, and not to call for assistance, there is no evidence that

27  Birks did this for any purpose other than to assess Plaintiff's medical status.

28

### f.     Plaintiff's Claim Against Octavio Luna Fails

Plaintiff's excessive force claim against Luna fails because it is based on his excessive force claims against Bellamy, Armas-Carl, Monroe and Birks, which fail for the reasons discussed above.

### g.     Defendants are Entitled to Qualified Immunity

Plaintiff cannot identify a single case in which a use of force not exceeding the amount needed to gain compliance with an institution's valid security policy was held unconstitutional under substantive due process.

Plaintiff cites one case, *Picariello v. Fenton*, 491 F.Supp. 1026, 1038-1039 (M.D.Penn. 1980), in which the court held that an inmate was "subjected to a battery by being confined in restraints in his cell for an extended period." *Picariello v. Fenton*, 491 F.Supp. at 1038.  The court did not conclude that the restraint violated any constitutional rights and the facts are distinguishable.  The plaintiff at issue, Glick, was kept shackled and handcuffed for 36 hours after he and several other inmates had removed their restraints while being transported to the prison on a bus.  *Picariello*, 491 F. Supp. at 1029, 1040.  The court held:  "The Court has searched the record for evidence to support the decision to place Glick in restraints for the initial 36 hour period and finding none must conclude that that action was unreasonable and tortious."  *Id.*, at 1040.

Here, the only time any defendant restrained Plaintiff was after he twice physically resisted being moved, in each instance the restraint was brief and done for the purpose of containing Plaintiff, and Plaintiff admits that no force was used beyond what was needed to contain him.  To the extent Plaintiff complains about being placed in "5-point restraints" for four hours after the July 25 incident (see TAC, at ¶40), there is no evidence that any defendant made the decision to put him in the 5-point restraints or decided how long to keep him in those restraints.

Plaintiff also cites *Valdez v. Farmon*, a case in which the plaintiff-inmate (Valdez) alleged that prison guards ordered her to strip for a search in front of male

guards, that she refused, and a taser gun was used on her to gain her compliance. *Valdez v. Farmon*, 766 F.Supp. 1529, 1531-1532 (E.D.Cal. 1991.  The court held that Valdez could argue that her refusal to submit to the strip search was "a justifiable assertion of her Fourth Amendment rights," stating:  "If the jury were to find that plaintiff was ordered to strip in front of males under the circumstances set forth in the undisputed facts, plaintiff's refusal to do so could very well be a justifiable assertion of her Fourth Amendment rights.  Force used to compel prisoners to comply with orders violative of those rights may well be found excessive."  *Id.*, at 1535.  This proposition does not apply to Plaintiff's claims against Bellamy and Armas-Carl because they were enforcing a *valid* hospital security policy that did not violate Plaintiff's rights.[13]

Finally, courts have recognized that staff at institutions such as Patton, who are dealing with individuals committed to state-custody because they are deemed a danger to society, may constitutionally use force to effect institutional security measures.  *See Bell v. Wolfish*, 441 U.S. at 537 ("Once the Government has exercised its conceded authority to detain a person . . . , it obviously is entitled to employ devices that are calculated to effectuate this detention."); *Henderson*, 2007 WL 2778682, *2 ("In the context of detention prior to trial, a custodial authority may impose restrictions or even use force on a detainee in ways that are used in the detention facility to maintain safety and order-"legitimate governmental objectives" justifying restraints on pretrial detainees.  [Citation omitted**.]  Such force may be**

---

[13] As was recognized by the court in *Valdez v. Farmon*, the concept that prisoner can "say 'no' to prison officials who are unjustifiably about to infringe on [a] right" applies to "a **clearly existing** constitutional right."  *Id.*, at 1535.  The court noted it was "clearly established" at the time of the incident "that routine unclothed searches by members of the opposite sex from that of the prisoner/searchee, or unnecessary viewing of a prisoner's unclothed body by correctional officers of the opposite sex, violated a prisoner's right to privacy or the right to be free from unreasonable search and seizures."  *Id.*, at 1535.  Here, even if this Court finds that there any doubts about the constitutionality of Patton's security policy requiring that patients go to their Mall groups or the RER while the Mall treatment program was in session, the rule was facially valid and Bellamy and Armas-Carl are entitled to qualified immunity for enforcing that policy.

1    **lawful, so long as it is used to maintain safety and order and not to punish-in**

2    **the Eighth Amendment sense-the detainee for the alleged crime giving rise to**

3    **the justification for custody.")** (bold emphasis added)**;** *Ort v. White*, 813 F.2d

4    318, 324-325 (11th Cir., 1987) ("Prison officers must . . . have the authority to use

5    that amount of force or those coercive measures reasonably necessary to enforce an

6    inmate's compliance with valid prison rules and to protect themselves and the other

7    inmates").

8         **C.    Plaintiff's Claim Arising from Conditions in the RER Fails**

9         Plaintiff complains that the RER was crowded on four occasions, but produces

10   no competent evidence that this was intended to punish patients.  Plaintiff claims

11   "unidentified staff" stated the RER was crowded to "'annoy' patients into going to

12   Mall."  Opposition [Document 131], at page 15 of 16, lines 1-2.  Even assuming

13   this constitutes evidence, such statements would be inadmissible as hearsay.

14   Moreover, the evidence shows that Patton staff were also present in the RER, which

15   undercuts the notion that the conditions were designed to be so unpleasant as to

16   harass those present.  Depo., at 116, lines 2-4; Armas-Carl Decl., at ¶8; Loyarte

17   Decl., at ¶8.  Finally, none of the cases cited by Plaintiff concerning crowded

18   conditions of confinement involved a situation even remotely similar to this case.

19   Here, the conditions lasted for a few hours on four days within a two-week time

20   period.  Nor did any of those cases involve situations where the individuals could

21   have avoided the crowded conditions by going to another activity.  Here, Plaintiff

22   could have avoided crowded conditions in the RER by going to his Mall group.

23   Plaintiff admitted that he did not go to his Mall groups because he was "protesting",

24   and not because he felt going would harm him.  Depo., at page 75, lines 4-13.

25        Plaintiff complains that the RER was dirty, but there is no evidence that this

26   was done to punish patients.  Again, staff members were also present in the room.

27        Plaintiff claims that he and other patients were required to watch videos over

28   and over "to punish us for not going to Mall."  Id., at ¶12.  However, he presents no

1   evidence that any defendant was responsible, nor is there any evidence it was done

2   with punitive intent.  Notably, on one occasion Plaintiff left the RER while the

3   video was playing.  Depo., at page 188, lines 21-24.

4        Plaintiff also declares that on some occasions other patients in the Refusal

5   room "had communicable diseases such as flu."  Id., at ¶13.  Again, however, there

6   is no evidence that any defendant was responsible, or that it was intended to punish.

7        **D.   Plaintiff's Claim Against Siregar and Atkins Fails**

8        Plaintiff produces no evidence that the notations made in his chart by Siregar

9   and Atkins caused him any harm.  He produces no evidence that the decision to

10  place him in 5-point restraints was based in any way on the notations made by

11  Siregar  and Atkins.  Nor does Plaintiff dispute that both Atkins and Siregar made

12  their notations after he was put into five-point restraints.

13       **E.   Plaintiff Cannot Pursue a Claim Based on Section 884(b)(1)**

14       Plaintiff claims that he was denied the use of his property while in the RER

15  and that this violates California Code of Regulations, title 9, section 884(b)(1).  As

16  was pointed out in Defendants' memorandum, there is no indication that section

17  884(b)(1) applies to a temporary denial of access to possessions.  Plaintiff offers no

18  authority to the contrary.  Accepting his argument – that patients at Patton are

19  allowed continuous access to their rooms, and are allowed to carry whatever

20  personal property they want anywhere they go in the facility, unless the procedures

21  of section 884(b) are followed --, would lead to an absurd result.  At the very least,

22  Defendants are entitled to qualified immunity on such a novel claim.  Finally,

23  Plaintiff should not be allowed to pursue a procedural due process claim since no

24  such claim is stated in his TAC.

25       **F.   Plaintiff's State Law Claims Fail**

26       Plaintiff has presented no evidence that he submitted a tort claim to the

27  California Victim Compensation and Government Claims Board prior to filing this

28  lawsuit.  As a result, his state-law claims are barred.  "[California Government

Code] Section 950.2 provides that 'a cause of action against a public employee . . . for injury resulting from an act or omission in the scope of his employment as a public employee is barred' unless a timely claim has been filed against the employing public entity.  (See § 911.2.)"  *Fowler v. Howell*, 42 Cal.App.4th 1746, 1750, 50 Cal.Rptr.2d 484 (1996); *see Briggs v. Lawrence*, 230 Cal.App.3d 605, 612-13, 281 Cal.Rptr. 578 (1991).  Contrary to Plaintiff's argument, California law on this issue applies in federal courts to claims brought under California law.  *See Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 627 (9th Cir. 1988).

Finally, Plaintiff's complaint to the State Personnel Board does not satisfy the requirement that he submit a tort claim with the State.  See Cal. Govt. Code, §945.4 (West 2009) (claims against public entities must be presented to the public entity and acted upon by the "board"); §900.2 (West 2009) (for claims submitted to the State, "Board" means "the Victim Compensation and Government Claims Board").

## CONCLUSION

For the foregoing reasons, Defendants request the Court grant them summary judgment on all of Plaintiff's claims.

Dated:  November 19, 2009                Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of California
MARSHA S. MILLER
Supervising Deputy Attorney General


      /s/ Benjamin Barnouw
BENJAMIN BARNOUW
Deputy Attorney General
*Attorneys for Defendants Octavio Luna, John Benson, Denise Armas-Carl, Millicent Loyarte, Jonathan Monroe, Jim Birks, Roy Bellamy, Eddin Siregar and Jennifer Atkins*

LA2007502570
50524201.doc

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **Marc A. Endsley v. State of California, et al.**

No.:   **CV 06-6961 DSF (SS)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is 300 South Spring Street, Suite 1702, Los Angeles, CA  90013.

On November 19, 2009, I served the attached **REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ,** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Los Angeles, California, addressed as follows:

Mark A. Endsley, # 146967-5
Atascadero State Hospital
AT#058025-8
P.O. Box 7001
Atascadero, CA  93423
Plaintiff In Pro Per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on November 19, 2009, at Los Angeles, California.

| _____ | _____ |
| H Tennison | /s/ |
| Declarant | Signature |

LA2007502570
Document in ProLaw